# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**VENTURIA ABRAHAM,**

               **Plaintiff,**

**-vs-**                            **Case No.  6:06-cv-745-Orl-28KRS**

**MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,**

               **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

      This cause came on for consideration without oral argument on the Complaint filed by

Venturia Abraham, seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration

("SSA").  Doc. Nos. 7-8.  This matter has been referred to me for issuance of a report and

recommendation pursuant to 28 U.S.C. § 636(b) and Middle District of Florida Local Rule

6.01(c)(21).

## I.      PROCEDURAL  HISTORY.

      In June 2001, Abraham applied for disability benefits under the Federal Old Age, Survivors

and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401 *et seq*., (sometimes referred to

herein as "the Act").  R. 77-79.[1]  The application alleged that Abraham became disabled on

October 31, 2000.  *Id*.  Abraham's application was denied initially and on reconsideration. R. 60-

61, 64-65.

Abraham made a timely request for a hearing before an administrative law judge ("ALJ").

R. 66.  An ALJ held a hearing on November 7, 2002.  Abraham, represented by an attorney,

testified at the hearing. Steve Bast, a vocational expert ("VE"), also testified.  R. 27-57.

After considering the testimony and the medical evidence presented, including the

testimony by Bast, the ALJ determined that Abraham was not disabled for purposes of the Act.  R.

17-25.  Abraham requested review of the ALJ's decision. R. 12.  On February 11, 2004, the

Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 6-8.

Abraham then sought review by this Court.  *Abraham v. Barnhart*, No. 3:04-cv-184-HTS.[2]

The Honorable Howard T. Snyder, United States Magistrate Judge, issued an order reversing the

decision of the Commissioner and remanding for reconsideration.  R. 386-97. Judge Snyder's

order directed the Commissioner to do the following:

> (1) [R]e-evaluate and discuss the evidence of record bearing upon [Abraham's]
> psychological limitations, applying the proper evaluation technique; (2) articulate
> clear findings with regard to her mental restrictions; (3) propound to a vocational
> expert, as appropriate, a hypothetical incorporating all impairments; and (4)
> conduct any other proceedings deemed necessary.

---

[1]  The record indicates that Abraham was previously determined to have been disabled between 1983 and 1998.  Abraham reported to her attorney that this period of disability was for her "depression and bad back." R. 76.

[2]  The present complaint alleges that Abraham "resides in Orlando, Florida."  Doc. No. 1 ¶ 4.  Therefore, even though her earlier complaint was filed in the Jacksonville Division, it appears that this case is properly filed in the Orlando Division.

R. 396.  The Appeals Council vacated the ALJ's decision and remanded for additional proceedings consistent with the order of the Court.  R. 400.

On January 17, 2006, the same ALJ held a subsequent hearing at which Abraham, represented by an attorney, and Rick Robinson, a VE, testified.  R. 360-83.

Robinson identified Abraham's past relevant work as "nurse assistant," DOT 355.674-014, which is medium duty with a specific vocational preparation (SVP)[3] of 4; and, "counselor," DOT 195.107-018, which is sedentary duty with an SVP of 7.  R. 378.

The ALJ posed the following hypothetical question to Robinson:

> Assume . . . the claimant is 48 years old, has a high school education, plus 4 years of college.  Assume further that I find that she can perform light work, but is further limited by the following exertional and non-exertional impairments[:] she needs to avoid ladders and unprotected heights, she needs to avoid the operation of heavy moving machinery, needs to avoid concentrated dust, fumes or gases, she needs to avoid unusual stress, and she can occasionally bend, crouch, kneel, stoop, squat and crawl[;] can she perform any of her past relevant jobs?

R. 378.  Based on this hypothetical, Robinson opined that the claimant "may be able to . . . perform the job" of counselor.  R. 378.  Limiting the hypothetical to semi-skilled or less (entry level), Robinson opined that the claimant could perform the job of "telephone quotation clerk," DOT 237.367-046; or "election clerk," DOT 205.367-030.  R. 379-80.  Both of these positions are sedentary.  R. 380.  Expanding the hypothetical to include light work would allow "survey

---

[3]  The Dictionary of Occupational Titles (DOT) categorizes jobs according to SVP, which addresses the period of time necessary to learn the job. Another element of each DOT description, the reasoning requirement, addresses the need to exercise judgment and the complexity of the tasks to be performed. Westlaw DICOT Appendix C - Components of the Definition Trailer.

worker," DOT 205.367-054; "mail clerk," DOT 209.687-026; and "cashier II," DOT 211.462.010.

R. 380.  All of these positions usually allow fifteen minute breaks in the morning and afternoon,

with a lunch break.  R. 380.  Robinson also opined that employers would tolerate no more than

about three unexcused absences per year.  R. 380-81.  Abraham's attorney clarified some of the

VE's answers with respect to related positions, but did not raise any other issues.  *Id.*

After considering the testimony and the medical evidence presented, including Robinson's

testimony, the ALJ determined that Abraham was insured under OASDI through June 30, 2003.

R. 358.  The ALJ found that Abraham had not engaged in substantial gainful activity since the

alleged onset date of her disability. *Id.*

The ALJ concluded that the medical evidence showed that Abraham had disorders of the

spine, an affective disorder, high blood pressure, and headaches, which were severe impairments.

R. 353.  These impairments did not meet or equal any of the impairments listed in the applicable

social security regulations ("the Listings").[4]  R. 358.

With regard to Abraham's affective disorder, the ALJ wrote "[a]lthough . . . . [her]

affective disorders are mild, they impose more than just a minimal limitation and thus were

included in her severe impairments. She should avoid unusually stressful jobs.  Although [she]

reported impaired memory/concentration problems, that is not the case.  She functions very

effectively in day-to-day situations according to Dr. Valente," a consulting physician.  R. 356.  The

---

[4]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

ALJ also concluded that while Abraham had agoraphobia,[5] this condition was not severe because she had been able to work for many years despite having it.  R. 353-54.  The ALJ also noted a history of asthma diagnoses, but observed that Abraham took no medication for asthma.  R. 353.  Finally, the ALJ found that Abraham's "credibility is sketchy at best," and gave less weight to the opinion of Dr. Felix Toro, a consulting physician, because his opinion was based largely on her testimony.  *Id.*

The ALJ found that Abraham had the residual functional capacity (RFC) to lift and carry at least twenty pounds occasionally, and to stand, walk or sit for six hours in an eight-hour workday.[6]  R. 358.  She could occasionally climb, balance, stoop, kneel, crouch, or crawl.  *Id.*  She "should avoid ladders and unprotected heights or the operation of heavy moving machinery . . . [and] dust, fumes, or gases and unusual stress."  *Id.*

Because this RFC would permit her to perform her past relevant work as a case worker/counselor, the ALJ determined that Abraham was not disabled for purposes of the Act.  R. 358.  Alternatively, relying on the testimony of the VE, and considering the Medical-Vocational Guidelines ("the Grids"), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that there was a

---

[5]  Agoraphobia is "fear of being in places where help might not be available, and is usually manifested by fear of crowds, bridges, or of being outside alone."  Medline Plus, *Agoraphobia*, http://www.nlm.nih.gov/medlineplus/ency/article/000931.htm (last visited Aug. 30, 2007).

[6]  This determination is consistent with the RFC for light work.  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567.

significant number of other jobs Abraham could perform, including "Telephone Quotation Clerk; Election Clerk, Charge Account Clerk; Survey Worker; Mail Clerk; and Cashier II." R. 358.

Abraham requested an extension of time to file written exceptions. R. 346-47. This request was granted, R. 342-43, and Abraham submitted additional evidence to the Appeals Council. R. 309-26. However, it does not appear that she submitted written exceptions. *See* R. 308 (indicating that written exceptions would be forthcoming). There is no indication that the Appeals Council assumed jurisdiction.

## II.    JURISDICTION.

"[W]hen a case is remanded by a Federal court for further consideration, the decision of the [ALJ] . . . become[s] the final decision of the Commissioner after remand  . . . unless the Appeals Council assumes jurisdiction of the case." 20 C.F.R. § 404.984(a).   "The Appeals Council may assume jurisdiction based on written exceptions to the decision of the administrative law judge . . . file[d] with the Appeals Council" within thirty days, or by itself within sixty days of the date of the ALJ's decision. *Id.*   "If no exceptions are filed and the Appeals Council does not assume jurisdiction [within sixty days] . . . the decision of the [ALJ] becomes the final decision of the Commissioner after remand." *Id.* at (d).   In other words, "[w]hen . . . an action has been remanded previously for further consideration, a claimant dissatisfied with the ensuing decision may elect not to file exceptions.  If the Appeals Council does not review the case *sua sponte*, the decision [of the ALJ] becomes the Commissioner's final decision after sixty days." *Chamberlin v. Barnhart*, 382 F. Supp. 2d 867, 869 (E.D. Tex. 2005).

In this case, the ALJ's decision became the final decision of the Commissioner because the Appeals Council has not assumed jurisdiction over the matter. Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

**III.    STATEMENT OF FACTS.**

Abraham asserts two assignments of error: that the ALJ's hypothetical questions to the VE were inconsistent with his finding regarding environmental limitations; and, that the ALJ's description of her mental RFC was inadequate.  These are the only issues I will address.[7]

Because these are the only issues raised, there is no need to review all of the evidence. Rather, I will address only the evidence relevant to the consideration of Abraham's environmental and mental restrictions.

> *A.    Evidence from Abraham.*

Abraham was born August 30, 1958.[8]  She is 5'5" tall and weighed around 240 pounds at the time of her hearings.  R. 31, 365.  However, her weight had fluctuated and her normal weight was 135 pounds.  R. 31-32, 47.  She was divorced and had one child, who was twenty years old at the time of the second hearing.  R. 364.  She lived with family members.  R. 364, 375-76.

Abraham completed four years of college but did not receive a degree.  R. 31, 364.  She had previously worked as a counselor.  R. 34.  The position was sedentary, with few physical

---

[7]  The parties were advised that issues not specifically raised would be waived.  Doc. No. 9 at 2.

[8]  Abraham has provided a number of different birth dates.  In her application, she listed August 30, 1958.  R. 77; *see also* R. 100.  In the first hearing, she indicated it was August 30, 1954.  R. 30.  In the second hearing, she indicated May 30, 1958.  R. 364.  Judge Snyder found that Abraham's date of birth was August 30, 1958.  R. 387 n.2.

demands, and required her to walk, stand, sit, and write, or handle small objects for eight-hours per

day and stoop, kneel and crouch for an hour-and-a-half per day.  R. 92, 123. In this position,

Abraham provided counseling services for children in the juvenile justice system.  R. 372.  This

was a certified position, but her certificate was no longer current.  R. 372-73.  She had worked as a

nurse, and had been certified as a licensed practical nurse and certified nurse's aide.  R. 367.

These certifications were no longer current.  R. 367, 373.  She also had worked as a lead person at

a retail store, and in various secretarial and medical records jobs.  R. 34-35.

She had experienced headaches, neck, back and shoulder pain, depression, and

hypertension since 1984.  R. 43-44, 91, 374.  In September 2000, Abraham was in an automobile

accident, which exacerbated her conditions.  R. 34-35, 42.  At some point, she had "a bad problem

with asthma."  R. 367.  She did not smoke.  R. 367-77.

Abraham had been diagnosed with depression and bipolar disorder.  R. 45-46.  She

testified in November 2002, that she felt "okay," although most of the time she was depressed.  R.

48-49.  In January 2006, she testified that she experienced hallucinations several times a month.

R. 376.  She also reported a bad memory.  R. 102, 106, 110.  She had trouble sleeping.  R. 108,

114, 375. She took various medications for hypertension, "nerves," pain, and headaches.  R. 33-34,

366.

  B. *Medical Records.*

  1. Records Regarding Physical Impairments.

In March 2001, Abraham was seen at the emergency room for throat and chest pain and

problems breathing.  She was given medication and discharged.  R. 147-54.  Later that month, she

was seen at a different emergency room for chest pain, but left before the doctor could evaluate her.  R. 127-30.  Then, later in the month, she was seen at the first emergency room for hypertension and chest pain.  R. 138-45.  She also complained of chronic back and neck pain, and dizziness.  R. 139, 143.  The attending physician directed her not to work for two days.  R. 144.

Progress notes prepared by someone whose name is illegible indicate that between March and June 2001, Abraham was seen for severe hypertension, history of asthma, a record of depression, headaches that were described as migraines, and various other conditions.  R. 170-80. Abraham took various medications for depression, hypertension, and pain.  R. 173.

In April 2001, Abraham reported to Bao T. Pham, D.O., that she "experienced blurred vision, ringing in the ears, dizziness, easy fatiguability, anxiety, depression, pain all over, morning stiffness, numbness and tingling in the lower extremities as well as left upper extremity, noise and light sensitivity, personality change, impaired concentration, memory problems, slowed thought process, altered sexual function, and urinary inconsistency."  R. 231, 233.  She rated her pain as ten out of ten, but continued to perform activities of daily living.  R. 232. She also reported difficulty sleeping and rapid weight gain.  R. 233.  The impression was cervical and lumbosacral sprain/strain exacerbation, right knee and ankle and left knee sprain/strain, and to rule out post-traumatic stress syndrome.  R. 234.

In April 2002, M.W. Kilgore, M.D., a neurologist, indicated that Abraham had a history of hypertension, migraines, arthritis, depression, blackouts/fainting, and neck and back pain.  R. 286-89.  In May 2002, Abraham complained to Dr. Kilgore of ringing in the ears, speech difficulty, neck and back pain, muscle pain and weakness, dizziness, numbness, headache, and problems with

concentration and attention.  R. 280.  Dr. Kilgore also observed chest pain, "no asthma or cough

but is positive for shortness of breath," and anxiety.  *Id*.  The impression was cervical, dorsal, and

lumbosacral strain/sprain, post-traumatic headache, lumbosacral radiculopathy, and post-traumatic

stress disorder.  R. 281; *see also* R. 282-85 (progress notes).  Dr. Kilgore directed her to be on no-

work status.  R. 281.  Progress notes from June 2002 indicate that Abraham received epidural

shots for back pain.  R. 275.  She also reported headaches, neck and back pain, and that her legs

would give out.  *Id*.

In July 2002, Abraham was seen by L. Gayle Martin, M.D., for a cardiology consultation.

R. 304-06.  She complained of occasional sharp chest pain, shortness of breath with exertion, and

palpitations "off and on for a number of years."  R. 304.  The assessment was prior exposure to

diet drugs, hypertension, mild mitral regurgitation,[9] and history of palpitations.  R. 305.

In August 2002, Abraham was seen at the emergency room.  R. 290-300.  The impression

was chest wall pain, hypertension, urinary tract infection, and another condition for which the

medical records are illegible.  R. 291.  She also experienced painful respiration.  R. 293.

In October 2002, Dr. Pham completed a Residual Functional Capacity Questionnaire.  R.

301-03.  He indicated that Abraham's condition had not lasted, or could not be expected to last, at

least twelve months.  R. 301.  She could walk one city block without rest or severe pain.  She

could continuously sit for thirty minutes, stand for thirty to forty-five minutes, and sit, stand, and

---

[9]  Mitral regurgitation "is a disorder in which the heart's mitral valve suddenly does not
close properly, causing blood to leak (back-flow) into the left atrium (upper heart chamber) when
the left ventricle (lower heart chamber) contracts."  Its symptoms include rapid breathing,
shortness of breath, palpitations, chest pain, and cough.  Medline Plus, *Mitral regurgitation –
acute*, http://www.nlm.nih.gov/medlineplus/ency/article/000177.htm (last visited Aug. 30, 2007).

walk for a total amount of about two hours in an eight hour workday.  She would require getting

up every thirty minutes.  *Id*.  She would also require a job that would allow her to shift at will and

take unscheduled breaks.  R. 302.  She could occasionally lift up to ten pounds, and had

significant limitations against repetitive reaching, handling or fingering.  *Id*.  Her pain was likely to

result in frequent or constant interference with attention and concentration.  R. 303.[10]

2.   <u>Records Regarding Mental Impairments</u>.

In September 2001, Abraham was seen by Peter Knox, Psy.D., a clinical psychologist, at

the request of the state disability office.  R. 181-85.  She reported longstanding back pain, phobias,

difficulty being around people, asthma and arthritis.  R. 181.  She reported a history of some

outpatient mental health treatment, sleep problems, and anxiety.  R. 183.  She responded to

questions but appeared guarded and angry about questions about her marital and criminal histories.

R. 184.  There were no indications of behavioral or thought disorders, or of internal disturbances.

*Id*.  The diagnoses were dysthymia,[11] "personality disorder suspected," and a Global Assessment of

Functioning (GAF) score of 70.[12]  *Id*.  Dr. Knox concluded that Abraham "should have the ability

---

[10]  Because Dr. Pham concluded that her condition had not lasted, or could not be expected to last, at least twelve months, the ALJ gave this report little weight.  R. 356.

[11]  Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self esteem, poor concentration, difficulty making decisions, and feelings of hopelessness."  STEDMAN'S MEDICAL DICTIONARY 536 (26th ed. 1995).

[12]  The Global Assessment of Functioning (GAF) scale is used to report an individual's overall level of functioning. A GAF rating between 61 and 70 reflects: "Some mild symptoms (eg, depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (eg, occasional truancy, or theft within the household), but generally functioning pretty

to work in the field of counseling again . . . ." R. 184. He observed no impairments in work-related mental activities, memory and understanding, or concentration and persistence. R. 185. However, Dr. Knox also observed inconsistencies regarding her statements about her personal and medical history which indicated "there may be some exaggeration on her part and malingering is suspected." *Id*.

In June 2002, Abraham was seen by Felix R. Toro, M.D., for a consultative psychiatric evaluation. R. 270-72. Dr. Toro observed that Abraham's "long chronic history of psychiatric treatment" had required multiple medications and involved different diagnoses. R. 270. She reported severe mood swings consistent with bipolar disorder, and symptoms consistent with obsessive compulsive disorder. *Id*. She also complained of "poor sleep, anxiety, racing thoughts, being easily angered, inability to concentrate, and feeling like people are against her." *Id*. Dr. Toro did not observe any systematic delusional system. *Id*. He observed some checking behaviors but not hand-washing or other compulsions. *Id*. His diagnoses were bipolar affective disorder with psychosis and rapid cycling by history, obsessive compulsive disorder, and a GAF of around 40 or 50.[13] R. 272. He concluded that "[i]t appears [Abraham] wants to be gainfully employed, but she would have to go back in psychiatric treatment, including psychotherapy." *Id*. Dr. Toro also opined that Abraham would benefit from mood stabilizer and antidepressant medications. *Id*.

---

well, has some meaningful interpersonal relationships." HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998) (hereinafter SYNOPSIS OF PSYCHIATRY).

[13] A GAF rating of 41-50 reflects "Serious symptoms (eg, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (eg, no friends, unable to keep a job)." SYNOPSIS OF PSYCHIATRY at 299.

In October 2005, Abraham was seen by Jerry Valente, Ph.D., J.D., a clinical and forensic psychologist.  R. 434-50 (partially reproduced at R. 327-41).  Abraham reported anxiety, depression, hypertension, neck pain, back pain, shoulder pain, agoraphobia, audiovisual hallucinations, sleep disturbance, and problems with ambulation.  R. 434.  Her medical history also indicated asthma and arthritis.  R. 435.  Her psychiatric medical history included longstanding treatment for depression and anxiety with multiple medications; she also had chronic symptoms of bipolar disorder and obsessive-compulsive disorder.  *Id*.  Abraham indicated that her medical and psychiatric complaints were related to a work-related injury that occurred in the 1970s.  *Id*.  Her mood was angry and her affect was blunted; her thought processes were logical; and her memory was intact.  R. 436.

Dr. Valente observed no problems with ambulation, but a slow and stiff gait, posture and balance.  R. 434.  He also observed no problems with appearance, behavior, or speech.  R. 436.  Abraham was able to complete light housework, watch television and read.  She could drive and complete her activities of daily living without assistance.  R. 445.  She had driven herself to the examination.  R. 434.

Dr. Valente administered a number of tests.  The test results indicated nervousness, tension, unhappiness, and indifference to things she once enjoyed.  R. 440.  Her physical problems and depressed mood were likely related.  *Id*.  She was passive-dependent and highly introverted.  R. 441.  The diagnoses were dysthymic disorder, and bipolar disorder with psychosis and rapid

cycling by history.  R. 445.  Her GAF was 60.[14]  *Id*.  The prognosis was guarded.  *Id*.  Dr. Valente

"saw no evidence of a psychotic process or disorder of thought to [her] personality."  R. 446.

   According to Dr. Valente, Abraham "view[ed] herself as having so many problems that she

is no longer able to function effectively in day-to-day situations."  R. 445.  Therefore, Dr. Valente

concluded that her "low mood and pessimistic outlook on life weigh heavily on her and seemingly

keep her from acting to better her situation.  Her negative self-image and sense of frustration may

be very detrimental [to] her functioning in a work related environment."  *Id*.  Dr. Valente also

concluded that "[t]he test results suggest that Ms. Abraham is malingering, or, at a minimum,

exaggerating her symptomatology for self gain. [Her] clinical report is an exaggerated picture of

her present situation and problems. . . . It is highly probable that she is exaggerating her symptoms

in order to gain attention or services."  R. 446.

   Based on the foregoing, Dr. Valente concluded that Abraham's condition would affect her

ability to respond appropriately to supervision, co-workers, and work's pressures.  R. 449.  Dr.

Valente did not elaborate on the extent of this limitation.  R. 449.  Dr. Valente observed no

impairment in Abraham's ability to understand, remember, or carry out instructions, or any other

capacities.  R. 448-49.

---

   [14]  A GAF rating between 51 and 60 reflects: "Moderate symptoms (eg, flat effect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (eg, few friends, conflicts with peers or coworkers)."  SYNOPSIS OF PSYCHIATRY at 299.

C.     *Reviewing Professionals.*

1.     Records Regarding Physical Impairments.

In October 2001, Eric C. Puestow, M.D., prepared a Physical Residual Functional Capacity Assessment at the request of the SSA.  R. 191-98.  He indicated that Abraham could occasionally lift up to twenty pounds and frequently lift up to ten pounds.  R. 192.  She could stand, walk or sit for about six hours in an eight-hour work day.  *Id.*  She would have occasional limitations on climbing, balancing, stooping, kneeling, crouching, and crawling.  R. 193.  She needed to avoid concentrated exposure to hazards such as machinery and heights.  R. 195.  Otherwise, Dr. Puestow observed no manipulative, visual, communicative, or environmental limitations.  R. 194-95.  While he opined that "some pain may be credible," he also indicated that "[t]he severity or duration of the symptom(s) . . . is disproportionate to the expected severity or expected duration on the basis of the claimant's medically determinable impairments."  R. 196.

In March 2002, Donald Warren Morford, M.D., prepared another Physical Residual Functional Capacity Assessment at the request of SSA.  R. 199-206.  He came to largely the same conclusions as Dr. Puestow.  *Id.*  He also concluded that Abraham's symptoms "consistently exceed [the] findings in" the medical records.  R. 204.

2.     Records Regarding Mental Impairments.

In October 2001, Val J. Bee, Psy.D., a clinical psychologist, prepared a Psychiatric Review Technique.  R. 186-90.  Dr. Bee concluded that Abraham had dysthymia, an affective disorder, which was not severe.  R. 186-87.  Dr. Bee indicated that Abraham would have mild restrictions in activities of daily living, maintaining social functioning, and maintaining concentration,

persistence, and pace.  R. 188.  Dr. Bee concluded that the medical records did "not show severe mental impairment or limitation at this time."  R. 190.

In March 2002, Michael H. Zelenka, Ph.D., a clinical psychologist, also concluded that Abraham had possible dysthymia which was not severe.  R. 207-11.  He indicated the same limitations as Dr. Bee.  R. 209.  He concluded that the "[e]vidence supports only mild [symptoms] of depression," and that Abraham's activities of daily living were not significantly affected by mental problems.  R. 211.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V.   ANALYSIS.

As indicated above, Abraham only contends that the ALJ's hypothetical questions to the VE were inadequate based on her environmental limitations, and that the determination of her mental RFC was inadequate.

     *A.    Environmental Limitations.*

Abraham contends that the ALJ's conclusion that she "should avoid dust, fumes or gases," R. 358, amounts to a "flat prohibition on exposure to respiratory irritants," which is inconsistent with the questions posed to the VE that involved only a need to avoid concentrated exposure to such materials. Doc. No. 17 at 9.

The law in this circuit requires that the hypothetical questions posed by the ALJ to a VE be accurate and supportable on the record and include all of the particular claimant's limitations or restrictions. *Pendley v. Heckler*, 767 F.2d 1561, 1562-63 (11th Cir. 1985). However, "[t]he ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

The record does not support Abraham's argument that the ALJ's finding that she "should avoid" exposure to respiratory irritants means that Abraham cannot have any exposure to respiratory irritants. Dr. Kilgore once observed that Abraham had shortness of breath but specifically emphasized that there was no asthma or cough. R. 280. There are some other records reflecting that Abraham reported respiratory complaints, *see* R. 147-54 (problems breathing), R. 293 (painful respiration), R. 304 (history of shortness of breath), but no treating physicians diagnosed asthma or any other specific respiratory ailment or limitation, and Abraham introduced no evidence that she took medication for asthma. No treating physician indicated that Abraham's capacity was limited by environmental factors. Furthermore, neither of the reviewing professionals concluded that Abraham would need to avoid exposure to respiratory irritants.

Based on this record, even assuming that the ALJ's finding regarding Abraham's limitations against respiratory irritants was ambiguous, substantial evidence supports the ALJ's

description of this limitations in the hypothetical question to the VE as requiring that the claimant

"avoid concentrated dust, fumes or gases." R. 378.   Therefore, any error in the ALJ's description

of this limitation is harmless, *cf. Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (holding

that ALJ's erroneous reference to one grid level did not justify remand when the actual level

applied was consistent with the evidence).  As such, this assignment of error is unavailing.

        B.      *Determination of Abraham's Mental Residual Functional Capacity.*

On remand, the ALJ found that "[a]lthough . . . . [Abraham's] affective disorders are mild,

they impose more than just a minimal limitation and thus were included in her severe impairments.

She should avoid unusually stressful jobs.  Although [she] reported impaired

memory/concentration problems, that is not the case.  She functions very effectively in day-to-day

situations according to Dr. Valente." R. 356.  Furthermore, because she had been able to work for

many years despite her agoraphobia, the ALJ concluded that this impairment was non-severe.

Abraham does not challenge the ALJ's determination that her affective disorder was mild.

She does not challenge the determination that her agoraphobia was non-severe, and in any case,

this determination is supported by substantial evidence because she had worked despite the

condition.  She also does not challenge the ALJ's findings regarding memory and concentration

problems.  Rather, Abraham contends that the ALJ's determination that she should avoid "unusual

stress" provides an insufficient basis for the Court to review the ALJ's decision.  This argument is

based on Social Security Ruling 85-15, 1985 WL 56857,  which requires an individualized

consideration of the effects of stress in certain situations.

The ALJ found that Abraham had a combination of exertional and nonexertional

impairments, and that she could return to her past relevant work at step four of the sequential

analysis.  As such, SSR 85-15 is inapplicable in the present case because it applies only to

claimants who have no exertional impairments, *see Williams v. Halter*, 135 F. Supp. 2d 1225,

1239 (M.D. Fla. 2001), and it applies only to findings at step five of the sequential analysis.  SSR

85-15, 1985 WL 56857  at *4; *cf. Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995) ("[T]he

application of SSR 85-15 is limited to those cases in which the Commissioner finds that the

claimant is not disabled at Step V").   The cases cited by Abraham are consistent with this

analysis.  In *Allen v. Barnhart*, 417 F.3d 396 (3d Cir. 2005), a medical improvement case, the

claimant has only nonexertional mental impairments.  In *Lancellotta v. Sec'y of Health and

Human Servs.*, 806 F.2d 284, 285-86 (1st Cir. 1986), SSR 85-15 was discussed with respect to the

evaluation at step five of the claimant's ability to do work available in the national economy.

    With respect to the argument that the term "unusual stress" is too inspecific to be

reviewable, Abraham does not cite to any evidence that her past relevant work caused her "unusual

stress," however she chooses to define that term.  Furthermore, Dr. Knox concluded that Abraham

"should have the ability to work in the field of counseling again . . . ."  R. 184.  Additionally, the

ALJ made specific findings about Abraham's stress based on Dr. Valente's report. Accordingly,

the record is complete and the ALJ's conclusions are sufficiently articulated to permit this Court to

review the ALJ's decision.  Therefore, this argument is also unavailing.

## VI.   RECOMMENDATION.

For the reasons stated herein, I respectfully recommend that the Commissioner's decision be **AFFIRMED**.  I further recommend that the Court direct the Clerk of Court to enter judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within **eleven (11) days** from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal; any responses to written objections shall be filed  on or before September 17, 2007.

Recommended in Orlando, Florida on September 1 , 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy